[915 NE2d 1141, 886 NYS2d 846]

DEAN G. SKELOS et al., as Duly Elected Members of the New York State Senate, Respondents, v DAVID PATERSON, as Governor of the State of New York, et al., Appellants.

Argued September 11, 2009; decided September 22, 2009

**POINTS OF COUNSEL**

*Quinn Emanuel Urquhart Oliver & Hedges, LLP,* New York City (*Kathleen M. Sullivan, Faith E. Gay* and *Robert C. Juman* of counsel), and *Gleason, Dunn, Walsh & O'Shea,* Albany (*Thomas F. Gleason* and *Michael P. Ravalli* of counsel), for appellants. I. The Governor has clear statutory authority to fill a vacancy in the office of Lieutenant Governor by appointment, and exercise of that authority is entirely consistent with the New York Constitution. (*People ex rel. Henderson v Snedeker,* 14 NY 52; *Matter of Social Investigator Eligibles Assn. v Taylor,* 268 NY 233; *Matter of M.B.,* 6 NY3d 437; *People v Ercole,* 308 NY 425; *Yearke v Zarcone,* 57 AD2d 457; *Matter of Suffolk Regional Off-Track Betting Corp. v New York State Racing & Wagering Bd.,* 47 AD3d 133; *Matter of Davies,* 168 NY 89; *Mercado v Scribner,* 38 AD2d 444; *Matter of Hamlin,* 196 App Div 714; *Newman v Beckwith,* 61 NY 205.) II. The complaint should be dismissed as nonjusticiable for lack of standing or ripeness. (*Silver v Pataki,* 96 NY2d 532; *Matter of Posner v Rockefeller,* 26 NY2d 970; *Urban Justice Ctr. v Pataki,* 38 AD3d 20, 8 NY3d

958; *Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761; *Coleman v Miller,* 307 US 433; *Raines v Byrd,* 521 US 811; *New York State Assn. of Nurse Anesthetists v Novello,* 2 NY3d 207; *Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo,* 64 NY2d 233; *Matter of Prospect v Cohalan,* 65 NY2d 867; *Matter of Delgado v Sunderland,* 97 NY2d 420.)

*Lewis & Fiore,* New York City (*David L. Lewis, John Ciampoli* and *Elizabeth Colombo* of counsel), for respondent. I. Senator Skelos has standing to bring the action. (*Silver v Pataki,* 96 NY2d 532; *Matter of Graziano v County of Albany,* 3 NY3d 475; *511 W. 232nd Owners Corp. v Jennifer Realty Co.,* 98 NY2d 144; *Dennis v Luis,* 741 F2d 628; *Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761; *Matter of Posner v Rockefeller,* 26 NY2d 970; *Raines v Byrd,* 521 US 811; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801; *Boryszewski v Brydges,* 37 NY2d 361; *Russell v DeJongh,* 491 F3d 130.) II. The Governor has acted contrary to the State Constitution and violated the elective principle by "appointing" a Lieutenant Governor, which is not justified by a catchall section of the Public Officers Law. (*Matter of Suffolk Regional Off-Track Betting Corp. v New York State Racing & Wagering Bd.,* 11 NY3d 559; *Matter of Roher v Dinkins,* 32 NY2d 180; *Matter of Ward v Curran,* 266 App Div 524, 291 NY 642; *Matter of Mitchell v Prendergast,* 178 App Div 690, 222 NY 543; *Matter of O'Connell v Corscadden,* 243 NY 86; *People ex rel. Weller v Townsend,* 102 NY 430; *Matter of MacAdams v Cohen,* 236 App Div 361, 260 NY 559; *Matter of Wing v Ryan,* 255 App Div 163, 278 NY 710; *Matter of Trounstine v Britt,* 163 App Div 166; *Matter of Mitchell v Boyle,* 219 NY 242.) III. CPLR 6311 (1) is inapplicable to the case at bar. (*Matter of People ex rel. Derby v Rice,* 129 NY 461; *New York Cent. R.R. Co. v Lefkowitz,* 12 NY2d 305.) IV. Quo warranto is not the exclusive remedy when the matter is solely one of law. (*Matter of Delgado v Sunderland,* 97 NY2d 420; *People ex rel. McLaughlin v Board of Police Commrs. of City of Yonkers,* 174 NY 450; *Greene v Knox,* 175 NY 432; *Morris v Cahill,* 96 AD2d 88; *Matter of Gardner,* 68 NY 467; *Matter of Smith v Wenzel,* 171 App Div 123; *Matter of Ginsberg v Heffernan,* 186 Misc 1029; *Matter of Jones v Town Bd. of Town of Petersburg,* 35 Misc 2d 688; *Sellers v LaPietra,* 23 Misc 3d 368; *Matter of Brescia v Mugridge,* 52 Misc 2d 859.) V. The preliminary injunction was properly issued. (*Aetna Ins. Co. v Capasso,* 75 NY2d 860; *Doe v Axelrod,* 73 NY2d 748; *Montauk-Star Is. Realty Group v Deep Sea Yacht & Racquet Club,* 111 AD2d 909; *Automated Waste*

*Disposal, Inc. v Mid-Hudson Waste, Inc.,* 50 AD3d 1072; *Ying Fung Moy v Hohi Umeki,* 10 AD3d 604; *Nobu Next Door, LLC v Fine Arts Hous., Inc.,* 4 NY3d 839; *Golden v Steam Heat,* 216 AD2d 440; *The Employers' Liability Cases,* 207 US 463; *Youngstown Sheet & Tube Co. v Sawyer,* 343 US 579.)

*Michael J. Hutter,* Albany, for Gerald Benjamin and others, amici curiae. I. The absence of a constitutional or statutory basis allowing a Governor to appoint a person of his or her choosing to fill a vacancy in the office of Lieutenant Governor has been noted and justified by legal and academic scrutiny of the New York State Constitution's provisions governing that office over the past several decades and has never been questioned until now. (*Matter of Ward v Curran,* 266 App Div 524, 291 NY 642.) II. Article IV of the New York State Constitution precludes a Governor from filling a vacancy in the office of Lieutenant Governor by appointment of a person to that office. (*Matter of Ward v Curran,* 291 NY 642.) III. Public Officers Law § 43 cannot be used as the basis to recognize a power on the part of the Governor to appoint a Lieutenant Governor. IV. A purported political or financial crisis does not create a power on the part of the Governor to fill a vacancy in the office of Lieutenant Governor.

*Mauro Goldberg & Lilling LLP,* Great Neck (*Richard J. Montes* and *Matthew W. Naparty* of counsel), for Ricardo Montano and others, amici curiae. The Appellate Division's decision should be reversed as it: (1) creates a conflict with the fundamental purpose of NY Constitution, article IV, § 1; (2) strains the plain language of NY Constitution article IV, § 6 and is inconsistent with the rest of the text of article IV, § 6; (3) conflicts with this Court's prior decision in *Matter of Ward v Curran* (291 NY 642 [1943]); (4) does not adequately take into consideration prior attempts to amend the Constitution as it relates to filling a vacancy in the office of Lieutenant Governor; and (5) does not advance and protect the public's best interests. (*Matter of Foley v Bratton,* 92 NY2d 781; *Matter of Fay,* 291 NY 198; *Matter of Social Investigator Eligibles Assn. v Taylor,* 268 NY 233; *People ex rel. Henderson v Board of Supervisors of County of Westchester,* 147 NY 1.)

*Arthur N. Eisenberg,* New York City, and *Adriana C. Pinon* for New York Civil Liberties Union, amicus curiae. The promotion of a functioning legislative body and the restoration of the constitutional promise of republican form of government weigh

heavily in favor of the Governor's position in this case. (*In re Duncan,* 139 US 449; *Luther v Borden,* 7 How [48 US] 1; *Minor v Happersett,* 21 Wall [88 US] 162; *Attorney General of Mich. ex rel. Kies v Lowrey,* 199 US 233; *Gregory v Ashcroft,* 501 US 452; *Baker v Carr,* 369 US 186; *Nobu Next Door, LLC v Fine Arts Hous., Inc.,* 4 NY3d 839; *Doe v Axelrod,* 73 NY2d 748; *Klein, Wagner & Morris v Lawrence A. Klein, P.C.,* 186 AD2d 631.)

*Paul, Weiss, Rifkind, Wharton & Garrison LLP,* New York City (*Daniel J. Kramer, Jacqueline P. Rubin, Kevin R. Reich* and *Brendan F. Quigley* of counsel), for Partnership for New York City, Inc., amicus curiae. I. The public interest is well served by vacating the preliminary injunction. (*Aetna Ins. Co. v Capasso,* 75 NY2d 860; *Doe v Axelrod,* 73 NY2d 748; *Matter of Chatham Towers Inc. v Bloomberg,* 6 Misc 3d 814, 18 AD3d 395; *Interborough R. T. Co. v Lavin,* 247 NY 65; *De Pina v Educational Testing Serv.,* 31 AD2d 744; *Standard & Poor's Corp., Inc. v Commodity Exch., Inc.,* 683 F2d 704; *OraSure Tech., Inc. v Prestige Brands Holdings, Inc.,* 42 AD3d 348; *McDermott v City of Albany,* 309 AD2d 1004.) II. The appointment of a Lieutenant Governor provides certainty and stability to the business community. III. The appointment of a Lieutenant Governor provides the Governor a second-in-command to spearhead the State of New York's response to the current economic crisis.

*Weil, Gotshal & Manges LLP,* New York City (*Caitlin J. Halligan, Gregory Silbert* and *Dotan Weinman* of counsel), and *Richard Briffault* for Citizens Union of the City of New York and another, amici curiae. I. The Governor is authorized to fill a vacancy in the office of the Lieutenant Governor by appointment. (*People v Ercole,* 308 NY 425; *Mercado v Scribner,* 38 AD2d 444; *Matter of Hamlin,* 196 App Div 714; *Matter of Ward v Curran,* 266 App Div 524, 291 NY 642; *Matter of Radich v Council of City of Lackawanna,* 93 AD2d 559, 61 NY2d 652.) II. Because the administration of state government would be compromised if a vacancy in the office of Lieutenant Governor could not be filled, the balance of equities weighs against injunctive relief. (*Matter of Ward v Curran,* 266 App Div 524.)

*Stroock & Stroock & Lavan LLP,* New York City (*Charles G. Moerdler, Alan M. Klinger, Jeremy S. Rosof* and *Benjamin I. Rubinstein* of counsel), for United Federation of Teachers and others, amici curiae. I. The Governor's appointment of a Lieutenant Governor was a valid exercise of his power to act in the public interest in times of emergency. (*Home Building &*

*Loan Assn. v Blaisdell,* 290 US 398; *DeLury v City of New York,* 51 AD2d 288; *Matter of Cheesebrough,* 78 NY 232; *Matter of Schwab v Bowen,* 51 AD2d 574; *Yonkers School Crossing Guard Union of Westchester Ch., CSEA v City of Yonkers,* 51 AD2d 594; *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York,* 59 Misc 2d 556; *Matter of Subway-Surface Supervisors Assn. v New York City Tr. Auth.,* 44 NY2d 101; *Twentieth Century Assoc. v Waldman,* 294 NY 571; *Matter of Freeport Randall Co. v Herman,* 83 AD2d 812; *Matter of Johnson v Pataki,* 91 NY2d 214.) II. Article XIII, § 3 of the New York Constitution and Public Officers Law § 43 authorized the Governor's action, especially under the circumstances existing on July 8, 2009. III. The Appellate Division's contrary conclusions that Public Officers Law § 43 was unconstitutional as applied contravenes fundamental canons of statutory construction expounded by this Court and codified by the Legislature. (*Matter of Ward v Curran,* 266 App Div 524, 291 NY 642; *Rangolan v County of Nassau,* 96 NY2d 42; *People v Kleber,* 168 Misc 2d 824; *Matter of Tonis v Board of Regents of Univ. of State of N.Y.,* 295 NY 286; *People v Pagnotta,* 25 NY2d 333; *LaValle v Hayden,* 98 NY2d 155; *National Assn. of Ind. Insurers v State of New York,* 89 NY2d 950; *People v Finkelstein,* 9 NY2d 342, 908; *People v Couser,* 258 AD2d 74; *Matter of Smith,* 118 Misc 2d 165; *Matter of Beach v Shanley,* 62 NY2d 241.) IV. Reality and common sense echo the cited constitutional and statutory strictures that validate the Governor's sound exercise of his powers at a time of extraordinary turmoil in the affairs of the State of New York. (*DeLury v City of New York,* 51 AD2d 288.)

**OPINION OF THE COURT**

Chief Judge LIPPMAN.

The issue on this appeal is whether the Governor of the State of New York has the authority to fill a vacancy in the office of Lieutenant Governor by appointment. We now hold that he does.

I.

In November 2006, Eliot Spitzer and David Paterson were elected respectively to the offices of Governor and Lieutenant Governor. On March 17, 2008, Governor Spitzer resigned and, pursuant to article IV, § 5 of the New York Constitution, Lieutenant Governor Paterson became Governor. Fifteen months later, Republicans and Democrats split 31-31 in the Senate. Because each party recognized a different temporary

president of the Senate, this political deadlock complicated the conduct of day-to-day business in the Senate chamber. Moreover, it was not clear which one of the rival temporary presidents stood next in the line of gubernatorial succession.

On July 8, 2009, Governor Paterson responded to this situation by appointing Richard Ravitch to the office of Lieutenant Governor. Pursuant to article IV, § 6 of the Constitution, the Lieutenant Governor presides over the Senate and casts a tie-breaking vote on certain procedural matters. Governor Paterson relied on section 43 of the Public Officers Law in making this appointment.

The following day, plaintiff Dean G. Skelos, a State Senator elected from the 9th Senatorial District, commenced this action for a declaratory judgment that the Governor's appointment of Mr. Ravitch was unconstitutional.[1] He also sought to permanently enjoin the Governor from appointing any individual to the office of Lieutenant Governor. Plaintiff then moved to preliminarily enjoin Mr. Ravitch from acting in the capacity of Lieutenant Governor. Supreme Court, Nassau County, granted the preliminary injunction (25 Misc 3d 347 [2009]), and the Appellate Division, Second Department, affirmed (65 AD3d 339 [2009]). Thus, Mr. Ravitch has, to date, not presided over the Senate.

In assessing the likelihood of plaintiff's success upon the merits (*see Doe v Axelrod*, 73 NY2d 748, 750 [1988]), the Appellate Division held that

> "the Governor's purported appointment of Mr. Ravitch was unlawful because no provision of the Constitution or of any statute provides for the filling of a vacancy in the office of lieutenant governor other than by election, and only the temporary president of the Senate is authorized to perform the duties of that office during the period of the vacancy" (65 AD3d at 348).

The Appellate Division sua sponte granted the Governor leave to appeal from its order, and certified a question to this Court. We now reverse.

---

1. Senator Pedro Espada, Jr. initially joined Senator Skelos as a plaintiff in this action; however, Senator Espada did not file a brief on this appeal. We therefore refer to only one plaintiff for purposes of this opinion.

## II.

The Governor has raised a threshold question as to Senator Skelos's standing to sue in light of the stringent criteria for legislator standing that we adopted in *Silver v Pataki* (96 NY2d 532, 539-540 [2001]). The parties do not dispute, however, that the public's interest is best served by resolving the constitutional issue presented by the Governor's action as expeditiously as possible. Accordingly, assuming, without deciding, that Senator Skelos presently has standing to sue the Governor, we now proceed to the merits (*see Matter of New York State Assn. of Criminal Defense Lawyers v Kaye*, 96 NY2d 512, 516 [2001]; *Babigian v Wachtler*, 69 NY2d 1012, 1013 [1987]; *Matter of Roman Catholic Diocese of Albany v New York State Dept. of Health*, 66 NY2d 948, 951 [1985]).

## III.

Our State Constitution specifies that "[t]he legislature *shall* provide for *filling* vacancies in office" (NY Const, art XIII, § 3 [emphasis supplied]), and expressly contemplates that vacancies in elective office may be filled by appointment (*see id.*). In pursuance of the constitutional mandate imposed by article XIII, § 3, the Legislature has enacted three comprehensive and complementary provisions, i.e., Public Officers Law §§ 41, 42 and 43. The first of these, titled "Vacancies *filled* by legislature" (emphasis supplied), prescribes the means by which vacancies in the offices of State Attorney General and Comptroller are to be filled. The second, titled "*Filling* vacancies in elective offices" (emphasis supplied), generally requires that such vacancies occurring before September 20th of any year in office be filled by means of election at the next general election, but, in the case of a vacancy in the office of United States Senator, requires, in certain circumstances, a temporary appointment by the Governor "to fill such vacancy" (*see* Public Officers Law § 42 [4-a]). Notably, this section specifically excepts from its scope the elective offices of Governor and Lieutenant Governor. The last of these vacancy-filling provisions, section 43, the one upon which the Governor relied in his appointment of Mr. Ravitch, titled "*Filling* other vacancies" (emphasis supplied), is plainly intended as a catchall to complete the Legislature's satisfaction of the mandate of article XIII, § 3. Unlike its neighboring provision, section 42, section 43 does not specifically exclude any office from its application, but rather provides:

"If a vacancy shall occur, otherwise than by expiration of term, with no provision of law for filling the same, if the office be elective, the governor *shall* appoint a person to execute the duties thereof until the vacancy shall be filled by an election" (emphasis supplied).

It is not disputed that when Governor Spitzer resigned in March 2008, then-Lieutenant Governor Paterson became Governor for the remainder of Governor Spitzer's term (*see* NY Const, art IV, § 5). Nor can it be reasonably disputed that when Lieutenant Governor Paterson became Governor, he ceased being Lieutenant Governor, leaving a vacancy in that office. The first condition of the statute's applicability was thus met.

The second condition of section 43—that there be no provision of law (apart from section 43) for filling the vacancy—was also satisfied. The only other provision of law bearing upon how a vacancy in the office of Lieutenant Governor alone is to be dealt with is article IV, § 6 of the State Constitution, but its direction that "the temporary president of the senate shall perform all the duties of lieutenant-governor" applies only "during [the] vacancy or inability" and thus cannot fill or end the vacancy. Plaintiff does not appear to contend otherwise; indeed, the central contention of plaintiff's argument is that the Constitution requires that a vacancy in the office of Lieutenant Governor be preserved until the next quadrennial election.

An appointment under Public Officers Law § 43, in contrast to the devolution mandated by article IV, § 6, effectively fills the office in accordance with the command of article XIII, § 3; the article IV, § 6 devolution, although plainly necessary and useful to assure continuity of service in the short term, can at best provide only stopgap coverage of the function of the Lieutenant Governor. Properly understood, then, the two provisions— article IV, § 6 and Public Officers Law § 43—are complementary rather than duplicative and, accordingly, article IV, § 6 should not be construed, as it was by the Appellate Division, as a limitation upon gubernatorial appointment pursuant to Public Officers Law § 43. Article IV, § 6 merely states what is to occur while there is a vacancy; it does not, and cannot, consistent with the command of article XIII, § 3, be understood to state that the vacancy may not be filled.

The dissent places singular importance upon the apparent equivalence of the operative verbs in each of the provisions at issue—"execute" in Public Officers Law § 43 and "perform" in

article IV, § 6—arguing that the provisions must be understood as duplicative, and, accordingly, that neither provision may be applied to fill the office of Lieutenant Governor. But, a correct understanding of what the provisions at issue are intended to accomplish does not turn on whether or not these expressions are themselves semantically equivalent. When understood in context, each expression refers to a materially different assumption of authority: the assumption under section 43 is plenary, in accordance with the mandate of article XIII, § 3 that vacancies be filled, but that occurring pursuant to article IV, § 6, concededly, is not.

Nor does article XIII, § 3's proviso that "no person appointed to fill a vacancy [in elective office] shall hold his or her office by virtue of such appointment longer than the commencement of the political year next succeeding the first annual election after the happening of the vacancy" prevent the Governor from appointing a Lieutenant Governor. The intent of the constitutional limitation is clear; namely, to assure that appointments to elective offices extend no longer than is reasonably necessary to fill such offices by election. Where, as here, an office may not legally appear on the ballot except quadrennially (*see* NY Const, art IV, §§ 1, 6), and there will be a lengthy period before the next election for the office may be held, plaintiff's reading of the durational limitation at issue would result in an extended vacancy running the balance of an elective term. This appears to be fundamentally incompatible with the main object of article XIII, § 3, expressed unequivocally in its first clause, which, of course, is to assure that vacancies are filled.

We have never interpreted article XIII, § 3 to impose the requirement that plaintiff finds in it. Rather, we have held that the provision demands only that "when a vacancy in elective office occurs, the vacancy must be filled by election in the shortest space of time *reasonably* possible" (*Matter of Roher v Dinkins*, 32 NY2d 180, 188 [1973] [emphasis supplied]; *see also Matter of Mitchell v Boyle*, 219 NY 242, 248 [1916]). Other states have dealt with the issue of measuring the permissible length of an appointment to an elective office similarly, holding that when the length of the appointive term is tied to the "next election" or the "first proper election" subsequent to the vacancy, what is meant is the next election at which the office may be legally filled (*see People ex rel. Lynch v Budd*, 114 Cal 168, 171, 45 P 1060, 1061 [1896]; *State ex rel. Trauger v Nash*, 66 Ohio St 612, 620-621, 64 NE 558, 560 [1902]).

We also reject plaintiff's contention that article XIII must be read to forbid the appointment of a Lieutenant Governor so as to vindicate the elective principle. While there can be no quarrel with the proposition that, generally, election must be the preferred means of filling vacancies in elective office, it does not follow that the elective principle is preeminent when it comes to filling a vacancy in the office of Lieutenant Governor.

We, of course, were completely in agreement with this contention when, in *Matter of Ward v Curran* (291 NY 642 [1943], *affg* 266 App Div 524 [3d Dept 1943]), we unanimously affirmed a decision of the Appellate Division holding that, pursuant to article XIII of the Constitution and the then-current version of Public Officers Law § 42, a vacancy in the office of Lieutenant Governor was to be filled at the next annual election subsequent to the vacancy. Our determination, however, engendered dismay in the executive branch because it raised a real possibility that the offices of Governor and Lieutenant Governor would be filled by individuals from opposing parties with incompatible political and policy agendas. As a consequence of our decision in *Ward*, Governor Dewey entreated the Legislature to amend the law, and the Legislature responded, specifically excepting the offices of Governor and Lieutenant Governor from the reach of Public Officers Law § 42 and its mandate that vacancies in elective office be filled by election. Subsequent constitutional amendments, requiring that the Governor and Lieutenant Governor be elected together quadrennially and by a single ballot (*see* NY Const, art IV, §§ 1, 6), definitively eliminated any residual possibility that the executive branch would be split between members of opposing parties and, equally definitively, eliminated any possibility that a vacancy in the office of Lieutenant Governor might be separately filled by election in a nonquadrennial year.

The elective principle, upheld by the judiciary in *Ward*, was thus legislatively subordinated to assure the structural integrity and efficacy of the executive branch and has remained so ever since. If it is to be restored to primacy in filling a nonquadrennial vacancy in the office of Lieutenant Governor, that is a matter for constitutional amendment.

That election has been deemed impermissible as a means of filling a midterm vacancy in the Lieutenant Governorship does not, however, mean that the vacancy may not be filled. Indeed, in amending the Public Officers Law to remove the office of Lieutenant Governor from the election mandate of Public

Officers Law § 42, the Legislature did not alter section 43, which, in the aftermath of *Ward* is logically understood as applying to a vacancy in the Lieutenant Governorship.[2] A conclusion that naturally follows this pairing of action and inaction is that the Legislature, while desirous of eliminating the problematic prospect of a divided executive, fully intended that a vacancy in the office would be filled in accordance with the mandate of article XIII, § 3, and that it would be filled by appointment pursuant to section 43. Filling the office by gubernatorial appointment is entirely consonant with the purpose of the post-*Ward* legislative and constitutional amendments, whereas requiring that the office be left vacant risked a scenario of the sort that the Legislature at Governor Dewey's behest sought to avoid— one in which a president pro tem of the Senate, quite possibly of a party other than the Governor, would, while performing the duties of the Lieutenant Governor during a vacancy in the office, actively oppose the Governor's agenda and frustrate the work of the executive branch.[3]

To be sure, the subordination of the elective principle in this context is not entirely unproblematic. It does create the pos-

---

2. As the Attorney General pointed out in his 1943 pre-*Ward* opinion, "there [was] no distinction in language between [section 43] and section 42 of the Public Officers Law" (1943 Ops Atty Gen 378, 382). And at the time of the post-*Ward* amendment to the Public Officers Law, the Legislature was well aware that section 42 had been held to apply to the office of Lieutenant Governor, even though the office was not specifically mentioned. The same language, appearing in section 43, could not in this *Ward*-defined context have been understood to exclude the office of Lieutenant Governor.

3. The rationale for the post-*Ward* amendments was well summarized by Governor Dewey in his February 1953 address to the Assembly:

"Executive responsibilities in our government are so interwoven that the election of a Governor and Lieutenant Governor politically opposed to each other involves serious problems. As a practical matter the Governor must encounter difficulty in leaving the State even for a short period and on pressing public business. This has created the greatest embarrassment in other states, to the damage of public confidence in government and the injury of the public interest.

"Even more important, there is a great advantage in being able to entrust many of the complex administrative tasks of the Governor to an able Lieutenant Governor. I have done this repeatedly and with notable benefit to the people of the State. This would not have been possible if the Lieutenant Governor was required, as a matter of party loyalty, to lead the minority party." (Message of the Governor In Relation to Proposed Constitutional Amendment For Joint Election of Governor and Lieutenant Governor, Feb. 9, 1953 [1953 NY Legis Doc No. 36, at 3].)

sibility that an unelected individual will, for a time, occupy the State's highest office. Rules of succession are, however, inevitably imperfect and, at some stage of the devolution they direct, invariably compromise elective principles. Before us, however, is not the abstract question of whether it would be better in the case of a vacancy in the office of the Lieutenant Governor to fill the vacancy by election or by gubernatorial appointment subject to legislative confirmation or by gubernatorial appointment alone. For now, the Legislature, pursuant to an express grant of constitutional authority, has specified that the vacancy is to be filled not by election but by gubernatorial appointment alone—a determination that the Legislature is always free to revisit.

## IV.

Until today, the interplay between Public Officers Law § 43 and article IV, § 6 of the Constitution presented an open legal question. Indeed, as our dissenting colleagues detail at some length, the particular legal configuration governing the outcome of the present dispute did not even come into existence until after *Ward*, and there have been, prior to the vacancy at issue, only two post-*Ward* vacancies in the office of the Lieutenant Governor. While it has been suggested that these vacancies were left unfilled because of some consensus as to the unavailability of the power of gubernatorial appointment, it is at least equally likely that they remained vacant for purely political reasons. Given these circumstances, it is entirely understandable that plaintiff has acted vigorously to defend his interpretation of the relevant constitutional and statutory provisions. Having given due consideration to plaintiff's argument, however, we conclude that Public Officers Law § 43 affords the Governor the authority to fill a vacancy in the office of Lieutenant Governor by appointment.

Accordingly, the order of the Appellate Division should be reversed, without costs, the motion for an injunction denied and the certified question answered in the negative.

PIGOTT, J. (dissenting). Under the majority's rationale, the possibility exists that the citizens of this state will one day find themselves governed by a person who has never been subjected to scrutiny by the electorate, and who could in turn appoint his or her own unelected Lieutenant Governor. Because this is contrary to the text of the New York Constitution and affords Governors unprecedented power to appoint a successor, we respectfully dissent.

I.

When then-Governor Eliot Spitzer resigned and Lieutenant Governor David Paterson became our 55th Governor no one gave a thought or harbored a suggestion that he had the ability to appoint a Lieutenant Governor. This is not surprising since no Governor in the history of the State had done so. But after 15 months marked by a deeply troubled economy and a deadlock that paralyzed the State Senate, the Governor, prompted perhaps by understandable frustration, attempted on July 8, 2009 to unilaterally fill the post.

Shortly after the appointment, plaintiffs brought this action seeking judgment declaring that the Governor's action in appointing a Lieutenant Governor was unconstitutional. The Governor, as the majority notes, asserted authority to do so pursuant to section 43 of the Public Officers Law, a section referred to by all parties as a "catch-all provision." Until now, that provision had been used to fill vacancies in local offices but, in no instance, the second most important executive office in the state.

Supreme Court granted a preliminary injunction concluding, as relevant to this appeal, that the Senators "have alleged a usurpation of Senate power that gives rise to sufficient injury-in-fact falling within their zone of interest" and as such, they had standing to commence this action (25 Misc 3d 347, 359 [2009]). Addressing the likelihood of success on the merits, the court concluded that article IV, § 6 of the Constitution "strongly suggests that the office is to remain vacant until such time as a Governor is elected" and "[s]ince a Lieutenant Governor has never been appointed, this interpretation is consistent with historical practice." (Id.)

The court also reasoned that article XIII, § 3, which mandates the Legislature to fill "vacancies in office," did not apply to a vacancy in the office of Lieutenant Governor, because that constitutional provision permitted the appointee to serve only until the next election, while article IV, § 6 makes clear there can be no separate election for Lieutenant Governor. Therefore, since the Legislature is not empowered to fill the office of Lieutenant Governor under the Constitution, contrary to defendants' urging, section 43 of the Public Officers Law is not available for that purpose. As a result, the court concluded the Senators had established a likelihood of success on the merits and granted an injunction.

The Appellate Division affirmed, rejecting defendants' claim that Senator Skelos was without standing to bring the action,

noting that the Lieutenant Governor has the ability to control debate in the Senate chamber and to cast a vote to break a tie on certain procedural matters (65 AD3d 339 [2009]). It concluded that the Governor simply did not have authority to appoint a Lieutenant Governor. That court too rejected the Governor's reliance on Public Officers Law § 43 and determined that no provision of the Constitution nor any statute provides for the filling of the office of Lieutenant Governor other than by election.

## II.

Unlike the majority, we view standing as a threshold issue that must be resolved and we determine that Senator Skelos established that he is a proper party to pursue this claim. The test for determining a litigant's standing is twofold. "First, a plaintiff must show 'injury in fact,' meaning that plaintiff will actually be harmed by the challenged . . . action. As the term itself implies, the injury must be more than conjectural" (*New York State Assn. of Nurse Anesthetists v Novello*, 2 NY3d 207, 211 [2004], citing *Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 772-773 [1991]). Second, the injury plaintiff asserts must fall within his or her zone of interest (*Society of Plastics*, 77 NY2d at 773).

Our standing analysis begins—but does not end—with *Silver v Pataki* (96 NY2d 532 [2001]). In *Silver*, the Court held that Assembly Speaker Sheldon Silver—acting in his capacity as an individual legislator, and not as a legislative leader—had standing to pursue his claim that the Governor's exercise of line-item veto power exceeded the powers granted the executive in the State Constitution. The general rule is that an individual legislator can sue—on a vote nullification or usurpation of power theory—to vindicate a personal injury, although "lost political battle" claims are not cognizable. Speaker Silver was deemed to have standing even though there were many other identifiable persons and organizations directly harmed by the exercise of the vetoes—such as any party who would have benefitted from the vetoed legislation (*see Clinton v City of New York*, 524 US 417 [1998] [New York City, health care providers and others who would have benefitted from vetoed legislation successfully challenged constitutional validity of President Clinton's exercise of the line-item veto]). Thus, the Court found standing in *Silver* even though a dismissal of Speaker Silver's complaint would not have erected an impenetrable barrier to judicial consideration of that controversy.

Although Senator Skelos' contention that the Governor has exceeded his constitutional authority is different from the constitutional argument presented in *Silver*, his assertion of standing in this case is similarly legitimate. The *Silver* Court recognized that an individual legislator could initiate a lawsuit challenging vote nullification or usurpation of power by the Governor in the budget process, expressly rejecting the notion that only a majority of the legislative house could do so. This case does not involve the budget process but it does involve alleged overreaching by the Governor in a manner that directly affects each sitting Senator. Here it is claimed that the Governor has without constitutional authority installed an unelected person to serve as president of the Senate and, by that appointment, this private citizen has gained the authority to restrict the speech of elected Senators. This allegation of harm is not institutional in nature but is personal to each Senator.

The Lieutenant Governor's only constitutional duties are to preside over the Senate and, on occasion, issue a casting vote. If elected Senators cannot bring suit to challenge the alleged placement of a so-called "interloper" as the presiding officer of the body in which they serve, we are hard-pressed to identify who would have standing to object to this appointment. Granted, although he has expressed no inclination to do so, the Attorney General could initiate a quo warranto proceeding—but this is because a statute specifically grants him that right, not because he has standing under our common-law jurisprudence. Where a claim is justiciable—and here no one asserts that the controversy involves a political question rendering it inappropriate for judicial review—we have not interpreted our standing rules so strictly that they erect an impenetrable barrier to suit (*see Consumers Union of U.S., Inc. v State of New York*, 5 NY3d 327 [2005]; *Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 814 [2003]; *Boryszewski v Brydges*, 37 NY2d 361, 364 [1975]). But if we adopt the Governor's position, that is precisely what we would be doing—raising the specter that this very significant issue concerning the constitutional validity of the Governor's appointment would be unreviewable by the judicial branch. Although the majority has chosen not to decide the issue of standing, we think it important to articulate a resolution of the standing issue given the magnitude of this case.

We further reject defendants' contention that the controversy is not ripe for review because Ravitch has not yet presided over the Senate, restricted any Senator's speech, or issued a casting

vote. This argument ignores the fact that Ravitch has been precluded from doing so, first by a temporary restraining order and, later, by the preliminary injunction issued by Supreme Court and affirmed by the Appellate Division. It would be ironic for this Court to dismiss a litigant's claim because, in initiating the lawsuit and obtaining preliminary relief, he was successful at postponing the imminent harm he is suing to prevent. In addition, it is alleged that the Governor's motivation in making the appointment was, in large part, to put Ravitch in a position to issue the tie-breaking vote to resolve the Senate leadership impasse—an allegation that is eminently plausible given the circumstances surrounding the appointment. This litigation—commenced soon after the appointment was made—was therefore not precipitous.

Moreover, since there appears to be no dispute that any ripeness problem would disappear the moment Ravitch presided over the Senate and ruled on any point of order, dismissing this action would only postpone a ruling on the merits in a situation where the public is manifestly best served by prompt resolution of an important constitutional issue. Nothing would be accomplished by burdening the public or the parties with further delay just to allow this inevitable scenario to play out. Nor do the parties urge us to do so.

## III.

Arriving at the merits, we note that both sides concede that the Constitution does not expressly accord the Governor the power to appoint a Lieutenant Governor. Nor can the Constitution itself be read in such a way as to permit the Governor to make an appointment to that office. The Constitution does, however, provide a clear line of succession to the office of Governor, the very purpose of article IV.

Article IV, § 6 provides that in the event of a vacancy in the offices of *both* Governor and Lieutenant Governor (a simultaneous vacancy): "the temporary president of the senate shall act as governor until the inability shall cease or until a governor shall be elected." If this situation arises, article IV, § 6 mandates that a prompt election be held by requiring that "a governor and lieutenant-governor shall be elected for the remainder of the term at the next general election happening not less than three months after both offices shall have become vacant." Most definitely, the framers of the Constitution were intent on having the electorate promptly fill both vacancies.

Next, that section addresses a vacancy in the office of Lieutenant Governor only, while there is a sitting Governor:

"In case of vacancy in the office of lieutenant-governor alone, or if the lieutenant-governor shall be impeached, absent from the state or otherwise unable to discharge the duties of office, the temporary president of the senate shall perform all the duties of lieutenant-governor during such vacancy or inability."

Thus, the drafters of the Constitution logically placed the duties of Lieutenant Governor in the hands of a duly elected state Senator—one who is elected president of that body by the entire Senate, representing all citizens of this state.

The majority errs in deciding that this constitutional mandate merely provides for a "caretaker" role by the temporary president for a limited interim period until the Lieutenant Governor's office is filled by the Governor under the Public Officers Law. The majority also errs in reading the Public Officers Law, which contains specific provisions for filling vacancies in the offices of Comptroller, Attorney General, and United States Senator, to let the Lieutenant Governor's office fall into a "catch-all" with all other elected officials in the state no matter how minor. A review of Public Officers Law §§ 41-43 makes the majority's misreading of them clear. Together, they provide a comprehensive mechanism for dealing with vacancies in nearly every office in the state—but *not* that of Governor or Lieutenant Governor, who are separately treated in article IV, § 6.

Public Officers Law § 41, enacted pursuant to an express grant of authority in article V, § 1 of the Constitution, provides for the filling of vacancies in the offices of Comptroller and Attorney General. Section 42 provides for the filling of vacancies in other elective offices, but expressly excludes the offices of Governor or Lieutenant Governor. Finally, section 43 addresses the filling of all "other vacancies" and provides: "If a vacancy shall occur, otherwise than by expiration of term, *with no provision of law for filling the same,* if the office be elective, the governor shall appoint a person to execute the duties thereof until the vacancy *shall be filled by an election"* (emphasis added).

When viewed in light of the constitutional construct of the executive office, its powers and duties, Public Officers Law § 43 cannot be construed to confer the right to fill a vacancy in the

Lieutenant Governor's office. First, contrary to the majority's view, section 43 by its terms only permits the Governor to appoint someone to an office to "execute the duties" of that office until the office can be filled by an election for the remainder of the term. Yet article IV of the Constitution clearly provides that when there is a vacancy in the office of Lieutenant Governor, the duties of that office are assumed by the temporary president of the Senate—there is no language restricting the duration that the temporary president of the Senate fulfills those duties. This situation differs from the scenarios presented in cases like *People ex rel. Smith v Fisher* (24 Wend 215 [1840]) and *People ex rel. Henderson v Snedeker* (14 NY 52 [1856]), in which a deputy took over when an elected official such as a county clerk was unable to complete a term of office and the deputy was then properly replaced by a gubernatorial appointee. The statutes at issue in those cases made clear that the deputy was to perform the duties of the elected office only until someone else could be "elected or appointed" and therefore clearly indicated that the deputy's authority was intended to cease when the Governor appointed a replacement for the elected official. As such, the Court held that the deputy performed the duties of office only until the Governor appointed a replacement who, in turn, fulfilled the duties only until an election could be held.

In contrast, article IV, § 6 does not state that the temporary president of the Senate will fulfill the duties of the office of Lieutenant Governor only until someone else is appointed nor, unlike article V, § 1 (addressing the offices of Comptroller and Attorney General), does it specifically direct the Legislature to craft a procedure for filling a midterm vacancy in that office. Rather, the clause unqualifiedly states that the temporary president of the Senate is to perform the duties of the Lieutenant Governor "during such vacancy." Furthermore, article IV precludes a midterm election for the office of Lieutenant Governor because it requires the Governor and Lieutenant Governor to be jointly elected in quadrennial elections (unless there is a simultaneous vacancy in both offices [*see* art IV, §§ 1, 6]).

Because the Constitution, particularly article IV, § 6, instructs that the temporary president of the Senate, an elected official, is to "perform" the duties of Lieutenant Governor during a vacancy, it leaves no room for anyone else to "execute" the duties of that office under Public Officers Law § 43. In this regard, we note that neither this Court nor the Legislature has

ever drawn a distinction between "executing" the duties of an office and "performing" those duties. The cases the defendants cite for this questionable distinction do not support it. Furthermore, there are numerous statutes that use words like "execute," "fulfill," "perform," "discharge," "act as" and the like to confer precisely the same authority.[1] Article IV, § 6 of the Constitution similarly contains synonyms that describe the inability of officers to act and the obligations that devolve on their successors, indicating that these officials "discharge" duties, "perform" duties or "act as" their predecessors—and it is evident that all of these mean the same thing. There is simply no evidence that the Legislature intended that Public Officers Law § 43 apply to the office of Lieutenant Governor when it adopted that provision. And if it did, the result would be a conflict. Contrary to the majority's view that constitutional provisions are to be "harmonized" with statutes, it is axiomatic that where there is an incompatibility between the Constitution and a statute, the Constitution governs and the statute bows.

Of equal importance, article XIII, § 3 limits the duration of any appointment under section 43 by directing that "no person appointed to fill a vacancy shall hold his or her office by virtue of such appointment longer than the commencement of the political year next succeeding the first *annual* election after the happening of the vacancy" (emphasis added).[2] Yet, article IV, § 1

---

1. *See e.g.* County Law § 652 (1) (undersheriff shall "execute the duties of the office of sheriff" until a new sheriff is elected or appointed); County Law § 914 (deputy shall, "subject to the provisions of the public officers law, have all the powers and fulfill all the duties of the county clerk"); Town Law § 42 (until a successor is appointed, the deputy town supervisor shall "perform all of the duties of the supervisor"); Second Class Cities Law § 62 (deputy city comptroller "shall discharge the duties of the office" in the event of a vacancy).

2. If article XIII, § 3 is applied to a vacancy in the office of Lieutenant Governor under the facts presented here, since the vacancy occurred on March 17, 2008, this would mean that a midterm election would have had to be held in November 2008 (the first "annual election after the happening of the vacancy") and any appointee—who would have had to be chosen by the Governor before that time—could serve only until the winner of that midterm election took office at "the commencement of the [next] political year," which would have been January 1, 2009 (*see* art XIII, § 4). Such a midterm election is expressly precluded under several provisions of the Constitution (*see* art IV, §§ 1, 6) and, in any event, there was no appointment in 2008. Defendants argue that the time frames in article XIII, § 3 have not been strictly applied but, even reading some flexibility into the provision (and our precedent has not clearly done so), the fact remains that the clause requires a prompt election to replace an appointee and this must occur as soon as possible after the

mandates that the Governor and Lieutenant Governor run together and only on the quadrennial, thus barring the Lieutenant Governor from running for office separate from the Governor in a nonquadrennial year. These provisions, read together, can only be reasonably interpreted to mean that the drafters of the Constitution intended that a vacancy in the office of Lieutenant Governor remain unfilled until the next gubernatorial election, with the temporary president of the Senate performing the duties of Lieutenant Governor in the interim.

## IV.

The construction of our Constitution over two centuries refutes the majority's reading of it. This is not the first time that a vacancy in the office of Lieutenant Governor has arisen. There have been at least 10 occasions since the first New York Constitution was adopted in 1777 when the position of Lieutenant Governor has become vacant,[3] but no Governor has ever seen fit to assert that he had the power to appoint a Lieutenant Governor to fill the vacancy. On two of those occasions, there were midterm elections to fill the vacancies. But that cannot occur under our current Constitution, because both the Constitution and the Public Officers Law have since been amended in significant respects.[4]

The position of Lieutenant Governor was created in New York's first Constitution of 1777 (adopted before the United States Constitution), which provided for an election to fill a vacancy in that office in the event the Lieutenant Governor

vacancy arises. Certainly, it does not authorize a long-term appointment to fulfill a complete unexpired term.

3. The vacancies occurred in 1811, 1828, 1829, 1847, 1885, 1910, 1913, 1943, 1973 and 1985. Six occurred as a result of the succession of the Lieutenant Governor to the office of Governor. The remaining four stemmed from either the death or resignation of the Lieutenant Governor. The most recent vacancies occurred in December 1973 when Lieutenant Governor Malcolm Wilson succeeded to the Governorship upon the resignation of Nelson Rockefeller (Senator Anderson, temporary president of the Senate at the time, fulfilled the duties until the end of the term) and in February 1985 when Lieutenant Governor Alfred DelBello resigned (again, Senator Anderson fulfilled the duties until the end of the term).

4. The first of the two elections to fill Lieutenant Governor vacancies occurred in 1847 as a result of a special statute passed by the Legislature (*see* L 1847, ch 303). The constitutional validity of that statute was never challenged. The second such election resulted from *Matter of Ward v Curran* (266 App Div 524 [3d Dept 1943], *affd without op* 291 NY 642 [1943]).

died, resigned or was removed from office (*see* Constitution of 1777 art XX). But that clause was removed in the 1821 Constitution and no Constitution since that time has specified any procedure for filling a Lieutenant Governor vacancy. In this respect, our State Constitution was similar to the Federal Constitution, which did not contain a procedure for filling a vacancy in the office of Vice President until the adoption of the 25th Amendment in 1967. Instead, the New York Constitution has spelled out a chain of succession in the event of the death or other inability of the Governor or Lieutenant Governor, currently codified in article IV, § 6. The Constitution and the statutes upon which the defendants rely have never been read to permit appointment of a Lieutenant Governor, even though there have been many opportunities for prior Governors to advance such a reading.

The decision in *Matter of Ward v Curran* (266 App Div 524 [3d Dept 1943], *affd without op* 291 NY 642 [1943])—which involved the eighth Lieutenant Governor vacancy in New York's history—held that the Constitution, as it was then worded, permitted an election to fill the vacancy, but it does not support the majority's view that such a vacancy can be filled by appointment. The controversy underlying *Ward* arose in July 1943 when Lieutenant Governor Thomas Wallace died, creating a vacancy in the office of Lieutenant Governor. Governor Thomas Dewey and Wallace had been elected the previous November on the Republican ticket. Albert Ward, the State Chair of the Democratic Party, brought a mandamus proceeding against the Secretary of State to compel an election to fill the office of Lieutenant Governor in the upcoming November 1943 election. Both Governor Dewey and Attorney General Nathaniel Goldstein took the position that such an election would be illegal as the Constitution required that the Governor and Lieutenant Governor be chosen at the same time and for the same term (the Constitution did not yet require that these offices be elected jointly by single vote). They further asserted that article III, § 9 of the Constitution—a provision addressing the powers of the Legislature—directed the Senate to "choose a temporary president to preside in case of the absence or impeachment of the lieutenant-governor." (266 App Div at 526.) They did not, however, rest their analysis on the predecessor to article IV, § 6 because, at that time, it did not contain any language indicating

that the temporary president of the Senate assumed the powers of the Lieutenant Governor.[5]

In a divided decision, the Appellate Division directed the Secretary of State to conduct the election pursuant to the predecessor of Public Officers Law § 42. The majority reasoned that it was inappropriate for the person who fulfills the duties of Lieutenant Governor to be someone who was elected only by the voters of a single senatorial district. They emphasized: "It is a fundamental principle of our form of government that a vacancy in an elective office should be filled *by election* as soon as practicable after the vacancy occurs" (266 App Div at 526 [emphasis added]). The dissenter believed that such an election would be unconstitutional because article IV, § 1 contains the only provision authorizing an election for Governor or Lieutenant Governor and requires that such office be filled in quadrennial elections. Thus, he concluded that the office of Lieutenant Governor could not be filled at a general election that was not a quadrennial election. This Court affirmed without opinion (291 NY 642 [1943]).

Upset with this turn of events, Governor Dewey urged the Legislature to begin the process of amending the Constitution and to change Public Officers Law § 42 to preclude an election for the office of Lieutenant Governor (Message of Governor Thomas E. Dewey to the Legislature, Jan. 5, 1944, 1944 NY Legis Doc No. 1, at 17-18). The Legislature heeded the Governor's call on both counts. It immediately amended Public Officers Law § 42—the statute on which Ward had relied—so that it

---

5. The 1938 version of article IV, § 6 that was in effect when *Ward* was decided read as follows:

"The lieutenant-governor shall possess the same qualifications of eligibility for office as the governor. He shall be president of the senate, but shall have only a casting vote therein. If the office of governor become vacant and there be no lieutenant-governor, such vacancy shall be filled for the remainder of the term at the next general election happening not less than three months after such vacancy occurs; and in such case, until the vacancy be filled by election, or in case the lieutenant-governor be under impeachment or unable to discharge the powers and duties of the office of governor or shall be absent from the state, the temporary president of the senate shall act as governor during such inability, absence or the pendency of such impeachment. If the temporary president of the senate shall be unable to discharge the powers and duties of the office of governor or be absent from the state, the speaker of the assembly shall act as governor during such inability or absence. The lieutenant-governor shall receive for his services an annual salary of ten thousand dollars."

expressly excluded the Governor and Lieutenant Governor from its ambit (as it continues to do today) (*see* L 1944, ch 3). The Legislature also passed amendments to the New York Constitution that were ultimately adopted by vote of the People.

More specifically, article IV, § 6 was amended in 1945 to add a provision directly addressing what is to occur when there is a vacancy in the office of Lieutenant Governor alone.[6] This amendment was significant for several reasons. Whereas the 1938 version of this clause did not indicate that the temporary president of the Senate fulfills the duties of Lieutenant Governor during a vacancy in that office, the 1945 version expressly so provided. Furthermore, the 1945 version indicated precisely what was to occur when there was a vacancy in the office of Lieutenant Governor alone—"the temporary president . . . shall perform all the duties of lieutenant-governor . . . during such vacancy." The 1945 amendments also stated that the Lieutenant Governor can never be separately elected from the Governor. These constitutional amendments, combined with the

---

**6.** The 1945 version of article IV, § 6 provided:

"The lieutenant-governor shall possess the same qualifications of eligibility for office as the governor. He shall be president of the senate, but shall have only a casting vote therein. The lieutenant-governor shall receive for his services an annual salary of ten thousand dollars.

"If the office of governor become vacant and there be no lieutenant-governor, *the offices of governor and lieutenant-governor* shall be filled for the remainder of the terms at the next general election happening not less than three months after the vacancy in the office of governor occurs. *No election of a lieutenant-governor shall be had in any event except at the time of electing a governor.* Until the vacancies in the offices of the governor and lieutenant-governor be filled by election, the temporary president of the senate then in office or his successor as such temporary president shall *perform all the duties of lieutenant-governor* and shall act as governor.

"*If the office of lieutenant-governor alone be vacant, or in case the lieutenant-governor be under impeachment, unable to discharge the powers and duties of the office of governor or shall be absent from the state, the temporary president of the senate then in office or his successor as such temporary president shall perform all the duties of lieutenant-governor, including the duty of acting as governor when necessary, during such vacancy, inability, absence or the pendency of such impeachment.*

"If . . . the temporary president of the senate . . . be unable to discharge the powers and duties of such office or be absent from the state, the speaker of the assembly shall act as governor during such inability or absence" (emphasis added to identify new language).

legislative amendment to Public Officers Law § 42, overruled *Ward*.

In the years since 1945, other constitutional amendments have moved still further away from *Ward*'s holding. In 1953, the Constitution was amended to require that the Governor and Lieutenant Governor be "chosen jointly, by the casting by each voter of a single vote applicable to both offices" (art IV, § 1), echoing another of Governor Dewey's recommendations. Additional clarification of the chain of succession occurred in 1949 and 1963 amendments.

Defendants and the majority use *Ward* as support for the conclusion that a vacancy in the office of Lieutenant Governor can be filled through gubernatorial appointment under Public Officers Law § 43. They contend that, unlike Public Officers Law § 42, section 43 was not amended in the wake of *Ward* to expressly exclude the office of Lieutenant Governor. But nothing in *Ward* suggests that section 43 ever applied to that office. *Ward* held that the Lieutenant Governor vacancy could be filled by election—not by gubernatorial appointment. In *Ward*, the Appellate Division majority determined that it would be inappropriate to allow the office of Lieutenant Governor to be filled by the temporary president of the Senate for the entire unexpired term because that legislative leader had been elected only by the voters of one district of the state. It seems highly unlikely that the *Ward* court would have endorsed the notion that a Lieutenant Governor could be appointed by a Governor with no input from the electorate and no vetting by the legislative branch of government.

In fact, shortly before the litigation, Attorney General Goldstein issued an opinion clarifying that such an appointment would be inconsistent with the constitutional and statutory scheme. Citing Public Officers Law § 43, the Attorney General observed:

> "No one has ever claimed that this section conferred upon the Governor the power to appoint his own successor. Such a contention would lead to the anomalous result that a Governor by appointing a Lieutenant-Governor and then resigning could impose upon the people his own choice as their Governor" (1943 Ops Atty Gen 378, 382, available at 1943 WL 54210, *4).

This point, which was repeated in the Attorney General's brief

in *Ward,* was not disputed by the parties or the Appellate Division.

As we noted, the fact that no Governor has previously attempted to appoint a Lieutenant Governor, while significant, does not resolve the legal issue before us. But it does show a remarkable consensus that such an appointment was impermissible. This consensus may result in part from a similarity between our Constitution and the Federal Constitution, which lacked a procedure for filling a vacancy in the office of Vice President until a constitutional amendment was adopted in 1967. The 25th Amendment (§ 2) now provides: "Whenever there is a vacancy in the Office of the Vice President, the President shall nominate a Vice President who shall take office upon confirmation by a majority vote of both Houses of Congress." New York constitutional commentators and participants at constitutional conventions have examined whether it would be advisable to adopt a similar mechanism by which the Governor could fill a vacancy in the office of Lieutenant Governor by appointment. Proposals for constitutional amendments have been submitted over the years that would have authorized gubernatorial appointment with the advice and consent of the Senate (*see* Proposition No. 923, 8 Proceedings of the Constitutional Convention of the State of New York, June 12, 1967, at 606-608) or, comparable to the 25th Amendment, with confirmation by a majority vote of both houses of the Legislature (*see* 1985 Rep of NY Law Rev Commn, reprinted in 1985 McKinney's Session Laws of NY, at 2483, 2575). To date, none of these proposals has been acted upon.

Supporters of the proposed amendments, like the Governor and some of the amici curiae, make strong policy arguments in support of allowing the Governor to make an appointment to fill a vacancy in the office of Lieutenant Governor. But since our Constitution does not currently permit such a procedure, the constitutional amendment process is the only appropriate vehicle for such a change.

## V.

The majority and defendants rely on decisions from other states to support their arguments but the cases cited are not persuasive. The constitutional provisions at issue in those cases were different from New York clauses that guide our analysis, either because there was no temporal provision that limited the duration that an appointee could hold an office to a specific and

ascertainable date (as there is in article XIII, § 3 of the New York Constitution) (*see People ex rel. Lynch v Budd,* 114 Cal 168, 45 P 1060 [1896]; *State ex rel. Trauger v Nash,* 66 Ohio St 612, 64 NE 558 [1902]; *State ex rel. Weeks v Day,* 14 Fla 9 [1871]; *In re Advisory Opinion to the Governor,* 688 A2d 288 [RI 1997]), or there was no clause directing that a particular official was to fulfil the duties of Lieutenant Governor in the event of a vacancy in that office alone (as there is in article IV, § 6 of the New York Constitution) (*see Advisory Opinion to Governor,* 217 So 2d 289 [Fla 1968]), or both provisions were absent (*see State ex rel. Martin v Ekern,* 228 Wis 645, 280 NW 393 [1938]). In any event, most of these cases were subsequently overruled by constitutional amendment or legislative enactment.

## VI.

Despite our disagreement, we join the majority in acknowledging the good faith and good intentions of all parties in this difficult and important case. At the time the Governor named a Lieutenant Governor, two Senators credibly claimed the position of temporary president of the Senate. The resulting uncertainty over the temporary president's identity created two practical problems. First, it clouded the line of gubernatorial succession; and second, the absence of an acknowledged presiding officer thwarted day-to-day business in the Senate. While the amici's dire characterizations of this political deadlock may be overstated, it is easy to understand why the Governor felt impelled to act and has vigorously defended his position. But neither the Governor nor this Court can amend the Constitution. Our Constitution's provisions governing gubernatorial succession have been scrutinized repeatedly over the past few decades, and have consistently been adjudged adequate. We should adhere to the Constitution we have, which simply does not authorize what the majority now sanctions.

Judges CIPARICK, READ and JONES concur with Chief Judge LIPPMAN; Judge PIGOTT dissents in a separate opinion in which Judges GRAFFEO and SMITH concur.

Order reversed, etc.